UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| L.L. and K.L., individually and by their parent, K.L., | : | Hon. Joseph H. Rodriguez |
| | : | |
| Plaintiffs, | : | Civil Action No. 13-3696 |
| | : | |
| v. | : | OPINION |
| | : | |
| EVESHAM TOWNSHIP BOARD OF EDUCATION, FLORENCE V. EVANS ELEMENTARY SCHOOL, LOU CASANOVA, JOHN SCAVELLI, PATRICIA LUCAS, NICK DIBLASI, GAETON LUCEBELLO, | : : : : : : | |
| | : | |
| Defendants. | : | |

This matter is before the Court on a motion for summary judgment under Fed. R. Civ. P. 56 filed by Defendants. The Court has considered the matter on the papers, pursuant to Fed. R. Civ. P. 78(b). For the reasons that follow, the motion for summary judgment [Doc. 38] will be granted in favor of the Defendants.

<u>Background</u>

The Complaint is captioned "L.L. and K.L., minors, individually and by their parent, K.L." as Plaintiffs.[1] At the time the Complaint was filed, June 14, 2013, L.L. was twelve years old and K.L., Jr. was ten years old. Both were students at Defendant Florence v. Evans Elementary School in Marlton, New Jersey within the purview of Defendant Evesham Township Board of Education. Also named as Defendants are the school's former Principal Lou Casanova, subsequent Principal Nick DiBlasi, school

---

[1] The body of the Complaint, however, also refers to the adult parent K.L. as a Plaintiff.

Superintendents Patricia Lucas and John Scavelli, Jr., and Gaeton Lucebello, Assistant Principal of DeMasi Middle School in Evesham Township.

The Complaint alleges that in or around November 2007, Plaintiffs' father, K.L., verbally complained to a Florence Evans teacher during a conference that L.L. and K.L., Jr. were being treated differently from other students due to their race, African-American. Plaintiffs assert that, as a result, in March 2008, Defendant Principal Casanova filed a retaliatory complaint with the Division of Youth and Family Services (DYFS) concerning the minors' parents, citing statements he claimed the children made. Specifically, in or about March of 2008, Florence Evans personnel allegedly received a complaint from K.L., Jr. which led the school nurse and Defendant Principal Casanova to inspect L.L.'s body for bruises.[2] Further, it is alleged that the school guidance counselor advised K.L., Jr. at the time that he should not be breaking up fights between his parents.

———————————

[2] Casanova testified that in March 2008, K.L., Jr.'s kindergarten teacher, Mrs. Froio, reported that K.L., Jr. said, "there were some issues at home with his dad, and that dad was pouring cold water on him, or cold something on him, throwing him to the ground and mistreating his mother." (Goldstein Cert., Ex. B., Pl. Ex. 1, Casanova Dep., p. 13.) Casanova decided to speak to then-first-grader L.L. to try to corroborate what K.L., Jr. had told his teacher. (Id., p. 15-16.) He did so in the presence of the school guidance counselor, and as a result he completed a DYFS questionnaire that was forwarded to the district. (Id. at 25-26, 34.) Casanova testified that L.L. corroborated her brother's statement, "that dad was pouring cold stuff on their heads, throwing K.L., Jr. to the ground, and hitting them with a belt." (Id. at 27.) Casanova telephoned DYFS, reported that there may have been abuse occurring in the home, and DYFS took over from there. (Id. at 34.) Casanova also testified that he never involved the school nurse to check L.L. for bruises; "that never happened." (Id. at 38-40.) K.L., Jr. testified that he did state that his father poured cold water on his head. (Goldstein Cert., Ex. E, K.L., Jr. Dep., p. 36, 45.) K.L., Jr. also testified that his parents argued about spending money. (Id. at 44.) L.L. testified that she was called down to the school nurse in the presence of Casanova, the nurse lifted her shirt, but no one said anything at the time. (Goldstein Cert., Ex. F, L.L. Dep., p. 47-51.)

On April 8, 2008, Plaintiffs' father, K.L., verbally complained to the former Superintendent Defendant Patricia Lucas[3] regarding L.L.'s clothes having been altered by the nurse and Casanova to check for bruises.  Plaintiffs also allege that in or about April 2008, a reading teacher yelled at L.L. for reading a word incorrectly, but the Florence Evans teachers allegedly did not yell at Caucasian students.

On April 29, 2008, K.L. filed a formal complaint with the United States Department of Education Office for Civil Rights ("OCR") alleging that his children had been discriminated against due to race.  (Goldstein Cert., Ex. C.)  OCR determined that the district had a legitimate nondiscriminatory reason to file a report with DYFS; indeed, "it was obligated to make the report, based on its own policy and pursuant to applicable state law."  (Goldstein Cert., Ex. D.)  OCR further determined that the school nurse never inspected L.L. for bruises, as alleged.  (Id.)  In addition, OCR found that Casanova met with the reading teacher and another teacher present during the other incident alleged; both teachers denied that any yelling took place, but Casanova offered, verbally and in writing, to meet with Plaintiffs' father, K.L., and the reading teacher to address any concerns.  K.L. declined both offers.  (Id.)  Finally, OCR found that the guidance counselor never had a private meeting with K.L., Jr. in 2008 and there was insufficient evidence to conclude that the counselor spoke to K.L., Jr. about fights between his parents.  (Id.)

---

[3] Lucas testified that on April 30, 2008, she spoke to Plaintiffs' father and indicated that the district would honor his request to have Plaintiffs transferred to another school in the district "not because of the complaint to the Division of Social Services, but because in order to promote a better working atmosphere between [him] and the schools."  (Pl. Ex. 6, Lucas Dep., p. 38.)  K.L. ultimately did not go through with the transfer.

Next, Plaintiffs alleged that K.L., Jr.'s fingers "were smashed with a desk" by a Caucasian student in September 2008, but Defendant Principal Casanova took no remedial action against the other first-grade student.[4]  On December 11, 2008, L.L. urinated on herself when her second-grade teacher (Ludwig) did not allow her to use the bathroom, allegedly in retaliation for her father's complaints.[5]  In or about February 2009, an unidentified student allegedly referred to L.L. as the "whitest black person" she had ever seen, but L.L.'s teacher took no remedial action.  In or about March 2009, other unidentified students allegedly referred to L.L. as "stupid and dumb," but neither the teacher nor Defendant Principal Casanova took remedial action.  In or about August 2009, the Executive County Superintendent and Defendant Superintendent Lucas allegedly denied a formal request to have Plaintiffs removed from their school due to an allegedly hostile racial environment.  Similarly, the mayor of Evesham Township took no action regarding Plaintiffs' complaints of racial harassment.

On or about October 5, 2009, a Caucasian student pushed L.L. into a tree, injuring her wrist; another Caucasian student assaulted K.L., Jr. in the school bathroom on October 20, 2009[6]; and Caucasian students called L.L. "stupid" in her third-grade

---

[4] Casanova testified that he spoke to K.L., Jr.'s teachers who were present at the time of the incident; one of the teachers had investigated and determined that it was an accident that occurred while the students were moving their desks around in class.  (Casanova Dep., p. 43-45.)  K.L., Jr. testified that he had never had any problems with the other boy before this incident.  (K.L., Jr. Dep., p. 60.)

[5] L.L. testified that someone had written on the bathroom mirror in her class, and the teacher told the class that no one would be permitted to use the bathroom until the person who did so admitted it.  (L.L. Dep., p. 66-69.)  Casanova testified that as a result of this incident, he met with the teacher, informed her that she used poor judgment, and placed a letter in her file.  (Casanova Dep., p. 48-50.)

[6] The record contains a document dated October 20, 2009, signed by Casanova, which indicates that Casanova investigated this incident and spoke to K.L., Jr.'s father, informing him that the school's code of conduct would be enforced as to the other student.  (Goldstein Cert., Ex. K.)

4

class on October 21, 2009.  Although they were made aware of each situation, Defendants Casanova and Lucas are alleged to have taken no action.  In or about November 2009, teachers complained that K.L., Jr. and L.L. were roaming the halls of the school, but no "proof" of such accusation was provided to their father.  Although K.L. complained against the teacher (Oakes), no remedial action was taken by Casanova or the new Superintendent Defendant Scavelli.  Also in November 2009, Defendant Principal Casanova allegedly removed L.L. from class to ask her questions and a Caucasian student pushed K.L., Jr. while at the water fountain.  In or about December 2009, Caucasian students allegedly assaulted K.L., Jr., but upon complaint allegedly no remedial action was taken by Casanova or Lucas.[7]

In 2010, students on the school bus allegedly called K.L., Jr. names like stupid, dumb, and crybaby,[8] and harassed K.L., Jr. and L.L..  L.L. allegedly was denied a snack while other students ate on April 12, 2010.[9]  Three unidentified white boys allegedly assaulted K.L., Jr. in the bathroom and called him racially derogatory names on April 26, 2010.  On September 15, 2010, another fourth-grade student allegedly harassed L.L. by telling her, "I don't like you; I don't like your hairstyle."  K.L., Jr.'s third-grade teacher (Elliott) allegedly berated him in front of the class on September 17, 2010.  In all of these instances, Plaintiffs state Defendants Casanova and Lucas were informed, as was the Executive County Superintendent, but allegedly took no action.  After Plaintiffs'

---

[7] The record contains a document dated December 16, 2009, signed by Casanova, that states after investigating the incident, Casanova called the other student's mother and informed her that her son would be in-school suspended the following day.  (Goldstein Cert., Ex. G.)

[8] K.L. could not identify the students that allegedly called him these things on the bus. (K.L., Jr. Dep., p. 137.)

[9] L.L. testified that she did not recall such an instance.  (L.L. Dep., p. 100-101.)

father, K.L., was "treated with disrespect" at an October 11, 2010 conference allegedly in retaliation for filing complaints against Casanova and other staff members, he filed another formal complaint with the Department of Education on December 8, 2010 for "racial harassment, bullying, and retaliation."  At the same time, L.L. received failing grades from her teacher (Oakes).[10]

In 2011, a white student told L.L. that she did not like her skin color,[11] another white student allegedly referred to K.L., Jr. as a "Nigger" in the presence of the teacher,[12] and L.L. was sent to the Principal's office allegedly "for no reason and then told to go back to class."  An art teacher yelled at L.L. in front of other students and allegedly told her "you are the worst student I ever had."  On or about March 8, 2011, Defendant Casanova, referring to Plaintiffs in the presence of two teachers, allegedly said, "We know what kind of neighborhood we are in with you." [13]  On May 3, 2011, another complaint alleging racial harassment was filed with the Department of Education.

───────────────────

[10] That fall, L.L.'s teacher wrote to her father at least twice to express concern about the amount of instructional time L.L. had been missing during trips to the bathroom. (Goldstein Cert., Ex. I.)

[11] L.L. testified that in fifth grade, another girl, A.G., was mean to L.L. and told her "I don't like your hair, skin, or clothes."  (L.L. Dep., p. 80-83.)

[12] K.L., Jr. testified that a classmate in third grade *said* the N-word once; "He just went – was looking around and then he went and said the "N" word, went and just said it." (K.L., Jr. Dep., p. 87, 99.)  K.L., Jr.'s parents never complained to the teacher about this. (Elliott Dep., p. 22.)

[13] Casanova denied that specific wording, but testified that he said, "we know what neighborhood we're in," meaning "the neighborhood of misunderstanding."  (Casanova Dep., p. 57.)  Scavelli testified that he spoke to Casanova about this accusation and was assured that Casanova did not mean anything racially discriminatory by his comment. (Scavelli Dep., p. 81-82.)  Indeed, the record contains a March 22, 2011 letter from Scavelli to Plaintiffs' father addressing the March 8 conference concerns, indicating that Scavelli had followed up on K.L.'s complaints regarding the conference, and concluding that Scavelli was confident that Casanova's conversation was not racially charged.  (Pl. Ex. 4.)

On or about October 6, 2011, while in fifth grade, L.L. reported to her father that two boys attempted to kiss her against her will.  The new Principal Defendant DiBlasi, Superintendent Defendant Scavelli, and new Executive Superintendent Peggy Nickalossi were all informed,[14] but denied Plaintiffs' request to be separated from the school. Further, in November 2011, a school guidance counselor allegedly advised L.L. to tell a boy she had complained about that "she liked him."

In February 2012, Defendant Principal DiBlasi allegedly denied L.L.'s request to call home.  DiBlasi also allegedly referred to Plaintiffs' father, K.L., as "brother."[15]  On March 28, 2012 and April 19, 2012, L.L.'s teachers denied her requests to use the bathroom, on the March date, L.L. had an accident.[16]

In September of 2012, L.L. began attending DeMasi Middle School in the Evesham Township School District.  Plaintiffs contend that she was subjected to retaliatory harassment there immediately because Defendant Assistant Principal

---

[14] DiBlasi indicated that the boys had a different version of events, which L.L. later admitted was the truth.  He followed up with phone calls to the parents, and told them he would keep an eye on the situation at recess.  (Reply, Ex. E.)

[15] The only reference to this incident in the record is contained in an e-mail from DiBlasi to Plaintiffs' father.  It reads:  "On the morning of February 22, 2012, I was on drop-off duty on the side entrance of the gym when you pulled your car up to drop off your son and daughter at school.  You and I greeted each other, after which I stated toyou: "Have a good one, buddy."  You pulled away, but later returned and after waiting for traffic to pass, you asked me what I had just stated to you.  You specifically asked if I stated "have a good one, brother" and told me that the use of the word "brother" could have a racial overtone.  I informed you that I said: "Have a good one, buddy," and that I did not call you "brother."  You told me that I should call you "Mr. Lewis," and I said that from now on I would do that.  As you pulled away, I said to you: "Have a good one, Mr. Lewis." (Pl. Ex. 4, 2/22/12 e-mail exchange.)

[16] An April 5, 2012 e-mail from DiBlasi to Plaintiffs' father indicated that DiBlasi investigated the circumstances and found that upon arrival at a class to do make up work, L.L. was denied the opportunity to use the bathroom because the teacher wanted her do get some work done first.  DiBlasi apologized to K.J. and L.L. for embarrassment that was caused, and assured them that L.L. would be permitted to use the bathroom whenever she asks.  (Pl. Ex. 4, 4/5/12 e-mail exchange.)

Lucibello and other staff members allegedly would follow her around the middle school.[17]  A staff member allegedly followed L.L. into the bathroom and told her she had to leave because they were going to have a fire drill, and a gym teacher (Gagnon) allegedly pulled up L.L.'s shirt in the locker room.[18]  In December of 2012, L.L. and K.L., Jr. left the Evesham Township School District to attend private school.

In Count One of the Complaint in this matter, Plaintiffs allege violations of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, in that they were subjected to disparate treatment and a hostile educational environment because of their race.  Count Two alleges race discrimination in violation the NJLAD, including aiding and abetting by Defendants Casanova, Scavelli, Lucas, DiBlasi, and Lucebello.  Count Three alleges violation of 42 U.S.C. § 1981.  In Count Four, Plaintiffs allege violations of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, in that they were subjected to retaliation.  Count Five similarly alleges retaliation, but in violation of the NJLAD.  Count Six alleges retaliation in violation of 42 U.S.C. § 1981.  Count Seven alleges a violation of Plaintiffs' equal protection rights through 42 U.S.C. § 1983, and includes reference to Defendants' racially motivated practices, the Defendant School District's policy, custom, or practice of race discrimination and deliberate indifference to violations of civil rights.  Count Eight is for invasion of privacy and Count Nine alleges intentional infliction of emotional distress.

---

[17] Lucibello testified that he reached out to L.L.'s father early in the school year with concerns that L.L. was struggling with using her (combination lock) locker and getting from class to class.  (Pl. Ex. 5, Lucibello Dep., p. 15-16.)  Lucibello had assisted L.L. with her locker a few times.  (Id.)

[18] The police were called as a result of this incident; the investigation included an officer's review of video surveillance of the school which revealed that no appropriate contact took place between the gym teacher and L.L.  (Goldstein Cert., Ex. J.)

Defendants have moved for summary judgment on the entirety of the Complaint. In response to Defendants' motion for summary judgment, Plaintiffs argue that they have presented evidence that they were referred to in "inherently racist" terms, as follows: (1) Defendant Casanova allegedly said to Plaintiffs' father, K.L., "I know what neighborhood we're in with you"; (2) Defendant DiBlasi referred to Plaintiffs' father, K.L., as "brother"; (3) in February, 2009 L.L.'s Caucasian classmate referred to her as the "whitest black person I have ever seen"; (4) derogatory comments about skin and hair were made to L.L. by her classmates; (5) in March 2009, L.L.'s classmates allegedly called her "stupid and dumb"; (6) a Caucasian classmate referred to K.L., Jr. as a "nigger" in the presence of a teacher (Def. Ex. E, p. 87-97) without repercussion.

Summary Judgment Standard

A court will grant a motion for summary judgment if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (c). Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether

9

a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Andersen, 477 U.S. at 256-57.  Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  Credibility determinations are the province of the finder of fact.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## Analysis

Title VI provides that: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal

financial assistance." 42 U.S.C. § 2000d.  Thus, the statute prohibits intentional discrimination based on race in any program that receives federal funding.  See 42 U.S.C. § 2000d; Alexander v. Sandoval, 532 U.S. 275, 282–83 (2001).

The framework established by the Supreme Court in McDonnell Douglas Corporation v. Green for obtaining relief for employment discrimination pursuant to Title VII of the Civil Rights Act[19] applies to Title VI disparate treatment cases.  Manning v. Temple Univ., No. 03–4012, 2004 WL 3019230, at *5 (E.D. Pa. Dec. 30, 2004) (observing that the McDonnell Douglas analysis "has been adapted for the educational context"); see generally McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) (setting forth burden shifting analysis applicable to Title VII claims).  Thus, to prevail on a Title VI disparate treatment racial discrimination claim, a plaintiff must demonstrate prima facie that (1) he is a member of a protected class; (2) he suffered an adverse action by the defendants in his education; (3) despite being otherwise qualified; and (4) he was treated differently from similarly situated students who were not members of the protected class.  Serodio v. Rutgers, 27 F. Supp. 3d 546, 545-55 (D.N.J. 2014).

If the student makes out a prima facie case, the burden of production shifts to the school to establish a legitimate, nondiscriminatory reason for its actions.  See Fuentes v. Borough of Watchung, 286 F. App'x 781, 784–85 (3d Cir. 2008).  If the school establishes a legitimate, nondiscriminatory reason for its actions, the burden of

---

[19] Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a); Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).  In assessing claims under Title VII and related retaliation claims, courts apply the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973).  Analysis of claims made pursuant to the NJLAD generally follows the analysis of Title VII claims.  Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 498 (3d Cir. 1999).

production shifts back to the student to show that the defendant's proffered reason was a pretext for actual discrimination.  Id.  The Third Circuit has held that a plaintiff may defeat a motion for summary judgment by pointing "to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the [defendant]'s articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the [defendant]'s action."  Id.

In addition, a plaintiff may sue a school for money damages for its failure to address a racially hostile environment.  See Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 206 n.5 (3d Cir. 2001).  A plaintiff may recover for alleged "severe, pervasive, and objectively offensive" student-on-student harassment if the school "acts with deliberate indifference to known acts of harassment."  Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 633 (1999).  That is, a school may only be held liable for a Title VI claim of student-on-student racial discrimination when the school's response is "clearly unreasonable in light of the known circumstances."  Id. at 648.  A district court may conclude on a motion for summary judgment that a "response [is] not 'clearly unreasonable' as a matter of law."  Id. at 649.

When determining if the allegations are sufficient to state a claim against the school district for harassment of a student by other students, the Court must consider if the school district's deliberate indifference made a student vulnerable to the harassment.  Id. at 645.  Actionable harassment deprives the victim of equal access to the school's educational opportunities and has a "systemic effect on educational programs or activities."  Id. at 653.  The harassment must be "severe, pervasive, and objectively offensive," and rise above the level of "simple acts of teasing and name-

calling among school children . . . even where these comments target differences in [race]." Id. at 652.

Title VI also supports a private cause of action for retaliation.  See Peters v. Jenney, 327 F.3d 307, 320 (4th Cir. 2003).  To establish retaliation, a plaintiff must show that: (1) she engaged in protected activity under the statute; (2) the funded entity subjected her to an adverse action after or contemporaneously with the protected activity; and (3) a causal link between the adverse action and the protected activity, that is, the adverse action would not have occurred but for the protected activity.  Id.[20]  See also University of Texas Southwestern Med. Ctr. v. Nassar, 575 U.S. ----, 133 S. Ct. 2517, 2534 (2013).

Individual liability may not be asserted under Title VI.  Whitfield v, Notre Dame Middle Sch., 412 F. App'x 517, 521 (3d Cir. 2011).  Accordingly, the Defendants' motion for summary judgment on the Title VI claims will be granted as to all individual Defendants.

Plaintiffs' Title VI disparate treatment claim also fails as a matter of law because there is no record evidence that Plaintiffs were treated differently from similarly situated Caucasian students.  Plaintiffs' failure to come forward with such evidence also

---

[20] The NJLAD prohibits discrimination and retaliation against a person for opposing a practice because of race, color, religion, sex, or national origin.  N.J. Stat. Ann. § 10:5–12d.  A *prima facie* NJLAD claim of discriminatory retaliation requires a plaintiff to establish: (1) that he engaged in a protected activity known by the defendant; (2) that the defendant thereafter retaliated against the plaintiff; and (3) that the plaintiff's participation in the protected activity caused the retaliation.  Craig v. Suburban Cablevision, Inc., 660 A.2d 505 (N.J. 1995).

defeats their § 1983 equal protection claim,[21] § 1981 claim,[22] and NJLAD claim for discrimination. Each of these claims places a burden on Plaintiffs to prove that they were treated differently from a similarly situated person who is not a member of the protected class to which Plaintiff belongs.  See Serodio, 27 F. Supp. 3d at 555.

In addition, the majority of incidents cited by Plaintiffs do not tend to indicate racial animus, and are not sufficiently "severe and pervasive" for a hostile environment claim to survive summary judgment.  Further, the record reflects that the Defendant school district conducted investigations and meted out discipline in a manner not clearly unreasonable in light of the circumstances.

Finally, the instances of allegedly retaliatory action cited by Plaintiffs do not establish that the funded entity subjected Plaintiffs to adverse action causally linked to protected activity. Therefore, Plaintiffs' retaliation claims fail as a matter of law. Further, Plaintiffs' State common law claims are subsumed under those already discussed.

---

[21] Plaintiffs also have not identified a "relevant policy or custom [which] caused the constitutional violation . . . allege[d]."  See  Natale v. Camden County Corr. Fac., 318 F.3d 575, 583-84 (3d Cir. 2003).

[22] Section 1981 provides, in relevant part:
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  To establish a claim under § 1981, a plaintiff must show that: (1) she belongs to a racial minority; (2) the defendants intended to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute.  Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 569 (3d Cir. 2002).

Accordingly, Defendants' motion for summary judgment will be granted.  An accompanying Order will issue.


Dated:  September 30, 2015                      /s/ Joseph H. Rodriguez
                                                JOSEPH H. RODRIGUEZ
                                                U.S.D.J.